# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF SUFFOLK**

<table>
<tr><td>

Kim Ellen Shipman,

          Plaintiff,

    v.

The 3M Company (f/k/a Minnesota Mining and Manufacturing Co.); Angus Fire; The Ansul Company; Buckeye Fire Protection Company; Chemguard; National Foam; and the Town of East Hampton, New York

          Defendants.

</td><td>

Index No.

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

</td></tr>
</table>

      Plaintiff, Kim Ellen Shipman, individually and on behalf of all others similarly situated, by and through her attorneys, as and for her Complaint against defendants, The 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), Angus Fire, The Ansul Company, Buckeye Fire Protection Company, Chemguard, National Foam, and the Town of East Hampton, New York, alleges as follows:

## INTRODUCTION

      1.     Plaintiff, individually and on behalf of all others similarly situated, brings this action against all defendants for (i) medical monitoring, (ii) the immediate installation of water filtration systems, (iii) the connection to a municipal water source, and (iv) money damages for diminished property values, because their drinking water has been contaminated by chemicals manufactured and sold by defendants without warning users of the toxic effects these chemicals would have if introduced into the environment.  In the case of defendant Town of East Hampton,

plaintiffs allege that it negligently and carelessly allowed commercial businesses to operate on land leased from the Town of East Hampton, namely the East Hampton Airport and Industrial Road, while using chemicals manufactured by the other defendants and allowing those chemicals to be released into the local water supply.

2.  It is believed that for many years, the manufacturing defendants named above manufactured and sold Aqueous Film Forming Foam ("AFFF"), a firefighting suppressant agent, to entities who used, or operated near, the East Hampton Airport.

3.  Residents in the area near the East Hampton Airport and in particular, those in the Village of Wainscott, obtain their drinking water predominantly from groundwater pumped by either municipal or private wells. For years, these residents have been drinking water laced with dangerous chemicals, including perfluorooctane sulfonate ("PFOS") and perfluorooetanoic acid ("PFOA"). When consumed, PFOS and PFOA can cause serious health issues. Additionally, the presence of PFOS and PFOA in drinking water will necessarily and substantially diminish the value of local real estate.

4.  The manufacturing defendants manufactured AFFF that contained "fluorocarbon surfactants," believed to include PFOS, PFOA, and/or certain other perfluorinated compounds ("PFCs") that degrade into PFOS or PFOA. (PFOS, PFOA and the PFCs that degrade in to PFOS or PFOA are hereinafter referred to as "Toxic Surfactants.") The defendants' precise formulas for their AFFF during the relevant period have not been made public.

5.  As the manufacturers of AFFF, defendants knew or should have known that the inclusion of Toxic Surfactants in AFFF presented an unreasonable risk to human health and the environment.

6.  Nonetheless, defendants marketed and sold their products with the knowledge that

2

FILED: SUFFOLK COUNTY CLERK 03/21/2018 10:32 AM

NYSCEF DOC. NO. 2    Case 2:18-cv-02496-JS-AYS    Document 1-1    Filed 04/27/18    Page 4 of 34 PageID #: 11    RECEIVED NYSCEF: 03/21/2018

Toxic Surfactant-laden AFFF would be used in, among other things, training exercises and in emergency situations in such a manner that the dangerous chemicals would be introduced into the environment.

7.    It is likely that the residents of Wainscott and in the area that surrounds the East Hampton Airport have been exposed for decades to PFOS and PFOA at concentrations well above a safe drinking level. These innocent bystanders had no way to know that they were consuming water contaminated with PFOS and PFOA until the contamination was disclosed to them by East Hampton Town officials in or about October, 2017.

8.    Plaintiff brings this suit individually and on behalf of all others similarly situated to require all defendants to pay for (i) medical monitoring, (ii) the installation of water filtration systems, (iii) connection to a municipal water source, and (iv) money damages for diminished property values.

## PARTIES

### Plaintiff

9.    Plaintiff Kim Ellen Shipman owns real property located at 48 Westgate Road, Wainscott, New York 11975. Ms. Shipman receives her drinking water from a private well on her property.

### Defendants

10.    Defendant The 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133.

11.    Through at least 2002, 3M manufactured PFOS for AFFF and it manufactured AFFF that contained fluorocarbon surfactants.

3

12.     Defendant Angus Fire ("Angus") is part of Angus International, and has corporate headquarters in Bentham, United Kingdom. Angus Fire maintains a place of business in the United States at 141 Junny Road, Angier, North Carolina 27501.

13.     At all times relevant, Angus manufactured fire suppression products, including AFFF that contained fluorocarbon surfactants.

14.     Defendant The Ansul Company (hereinafter "Ansul") is a Wisconsin corporation, having a principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

15.     At all times relevant, Ansul manufactured fire suppression products, including AFFF that contained fluorocarbon surfactants.

16.     Defendant Buckeye Fire Equipment Company ("Buckeye") is a North Carolina corporation, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

17.     At all times relevant, Buckeye manufactured fire suppression products, including A FFF that contained fluorocarbon surfactants.

18.     Chemguard is a Wisconsin corporation, having a principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

19.     At all times relevant, Chemguard manufactured fire suppression products, including AFFF that contained fluorocarbon surfactants.

20.     National Foam, Inc. (a/k/a Chubb National Foam) (National Foam, Inc. and Chubb National Foam are collectively referred to as "National Foam") is a Pennsylvania corporation, having a principal place of business at 350 East Union Street, West Chester, Pennsylvania 19382.

21.     At all times relevant, National Foam manufactured fire suppression products, including AFFF that contained fluorocarbon surfactants.

4

22.     Defendant Town of East Hampton is located on the South Fork of Long Island, approximately 100 miles east of New York City in Suffolk County, New York.

23.     At all relevant times, the Town of East Hampton owned the property upon which the East Hampton Airport operates.  Over the years, the Town of East Hampton has permitted local fire departments and other first-responder organizations to use the East Hampton Airport for training drills and exercises.  Upon information and belief, those drills and exercises involved the use of AFFF (Aqueous Film Forming Foam).

24.     The Town of East Hampton also owns the property that includes Industrial Road in East Hampton.  Over the years, the Town of East Hampton has entered into real estate leases with commercial businesses who operated on Industrial Road.

25.     Upon information and belief, many of those businesses used the toxic chemicals manufactured by defendants and intentionally or negligently dumped, released or otherwise caused such toxic chemicals to be introduced into the local water system under circumstances in which they knew or should have known that such chemicals could and would harm the users of that water system.  The identity of those businesses is still being investigated but is believed to include Griffith's Carpet Cleaning and Applied Minds, L.L.C.

## JURISDICTION AND VENUE

26.     Jurisdiction is proper in this Court pursuant to New York Civil Practice Law and Rules Section 302(a)(1) because each of the manufacturing defendants transacts business within the state or contracts within or without the state to supply goods or services in the state.

27.     Venue is proper in this Court because the events or omissions by defendants giving rise to the claims asserted herein occurred in Suffolk County, have caused harm to Class Members residing in Suffolk County and all or nearly all class members reside in Suffolk County.

5

FILED: SUFFOLK COUNTY CLERK 03/21/2018 10:32 AM INDEX NO. 605271/2018

NYSCEF DOC. NO. 1    Case 2:18-cv-02496-JS-AYS    Document 1-1    Filed 04/27/18    Page 7 of 34 PageID #: 14    RECEIVED NYSCEF: 03/21/2018

## GENERAL FACTUAL ALLEGATIONS

### Background Regarding PFOS and PFOA

28.    PFCs are manmade chemicals that do not exist in nature.

29.    There are numerous chemicals in the PFC family, but the two most prevalent PFCs are PFOS and PFOA.

30.    PFCs, including PFOS and PFOA, have been widely used in industrial and commercial products due to their quality to repel water, oil, and grease.

31.    Companies used PFOS and PFOA to make, among other things, carpets, clothing, fabrics for furniture, paper packaging for food and other materials such as cookware that are resistant to water, grease or stains.

32.    Companies also used PFOS and other Toxic Surfactants specifically to make AFFF. PFOS and PFOA have unique properties that cause them to be classified as persistent, bioaccumulative, and toxic.

### Persistent

33.    PFOS and PFOA are persistent.  Due to the strength of multiple carbon-fluorine bonds, PFOS and PFOA break down very slowly in the environment.

34.    PFOS and PFOA are thermally, chemically, and biologically stable and resistant to biodegradation, atmospheric photo-oxidation, direct photolysis, and hydrolysis.

35.    PFOS and PFOA can persist in the environment for decades.

36.    PFOS and PFOA are also water soluble, making them mobile in groundwater and the environment.

37.    Typical municipal water treatment plants do not filter PFOS and PFOA from contaminated water due to the chemicals' physical properties.

6

38.     Similarly, chlorine and other disinfectants that are typically added to municipal drinking water systems do not remove PFOS or PFOA from contaminated water.

**Bioaccumulative**

39.     PFOS and PFOA arc bioaccumulative.

40.     Toxicology studies show that PFOS and PFOA are readily absorbed after oral exposure and accumulate primarily in the serum, kidney, and liver.

41.     PFOS and PFOA have a half-life within the human body of two to nine years.

42.     PFOS and PFOA can bioaccumulate up the food chain; can cross the placenta from mother to fetus; and can be passed to infants through breast milk.

**Toxic**

43.     PFOS and PFOA are toxic.

44.     There are a number of health risks associated with exposure to PFOS and PFOA, and these risks are present even when PFOS and PFOA are ingested at seemingly low levels (less than 1 part per billion).

45.     PFOS and PPOA exposure is associated with increased risk in humans of testicular cancer and kidney cancer, disorders such as thyroid disease, high cholesterol, ulcerative colitis, and pregnancy-induced hypertension, as well as other conditions.

46.     Epidemiological studies are ongoing and the full harm of PFOA and PFOS exposure is not yet fully understood.

47.     For example, epidemiological studies of PFOS and PFOA exposure in animals have shown the ability to cause other cancers.  Studies in lab animals have found that exposure to PFOS and PFOA also increases the risk of tumors in the liver, bladder, thyroid, and mammary

7

FILED: SUFFOLK COUNTY CLERK 03/21/2018 10:32 AM
NYSCEF DOC. NO.    Case 2:18-cv-02496-JS-AYS    Document 1-1    Filed 04/27/18    Page 9 of 34 PageID #: 16/21/2018

INDEX NO. 605271/2018

glands.

48.    The EPA also has advised that exposure to PFOS and PFOA may result in developmental effects to fetuses during pregnancy or to breastfed infants.

49.    Injuries, however, are not sudden; rather, they can arise months or years after exposure to PFOS and/or PFOA.

**AFFF Use at the Airport**

50.    AFFF that contained PFCs was developed in the 1960s as an alternative to existing firefighting foam.

51.    Upon information and belief, at any given time during its operation, the East Hampton Airport housed AFFF concentrate manufactured by defendants.

52.    Upon information and belief, the AFFF concentrate was stored in buckets, drums, or other containers.

53.    Upon information and belief, local fire departments and other first-responder organizations conducted training drills and exercises at the East Hampton Airport.

54.    Upon information, those training drills and exercises involved the use of AFFF.

55.    Upon information and belief, the use of AFFF for training purposes included suppressing fires and explosions on the ground, as well as coating runways in anticipation of difficult landings, all of which resulted in acres of foam-covered soil and blanketed wreckages.

56.    Upon information and belief, instructions and warning labels affixed to AFFF by the defendants did not adequately describe the scope of danger associated with use and disposal of AFFF.

57.    Upon information and belief, at no time prior to May 2000 did the defendants warn

8

Case 2:18-cv-02496-JS-AYS   Document 1-1   Filed 04/27/18   Page 10 of 34 PageID #: 17

the users of the AFFF of the health risks associated with use, disposal and bioaccumulation of AFFF components.

58.     Upon information and belief, at no time prior to May 2000 did the defendants warn the users of the AFFF of the health risks of introducing AFFF into the environment.

59.     Upon information and belief, at no time during the relevant period did the defendants warn users of the AFFF that ingredients in the AFFF were persistent, bioaccumulative and toxic, or that, once introduced into the environment, its chemical components would readily mix with ground and surface water and migrate into the local water supply, contaminating the surrounding communities, possibility harming people and causing property values to decrease.

60.     In 2002, 3M ceased production of AFFF manufactured with PFOS due to health and environmental concerns.

61.     Upon information and belief, 3M and the other defendants knew of these dangers for years.

62.     Even though 3M, who was the predominant manufacturer of PFOS-based AFFF, ceased production of PFOS-based AFFF in 2002, neither 3M nor any other defendant that used a Toxic Surfactant recalled its dangerous products.

63.     According to one study, as of 2011, there were still 1,972,000 gallons of PFOS-based AFFF stockpiled in the United States.

**Regulatory Action for Safe Drinking Water**

64.     The EPA has a process to monitor and, in some cases, regulate emerging contaminants of concern.  These processes include, among others, Contaminant Candidate Lists, the Unregulated Contaminant Monitoring Rule, and Health Advisories.

65.     A "Contaminant Candidate List" is a list of contaminants that are currently not

9

FILED: SUFFOLK COUNTY CLERK 03/21/2018 10:32 AM

NYSCEF DOC. NO. 1   Case 2:18-cv-02496-JS-AYS   Document 1-1   Filed 04/27/18   Page 11 of 34 PageID #: 18   INDEX NO. 605271/2018

RECEIVED NYSCEF: 03/21/2018

subject to any proposed or promulgated national primary drinking water regulations, are known or anticipated to occur in public water systems and may require regulation under the Safe Drinking Water Act. The Safe Drinking Water Act requires the EPA to publish the Contaminant Candidate List every five years.

66.     In 2009, the EPA's Third Contaminant Candidate List included PFOS and PFOA.

67.     In 2009, the EPA also established a Provisional Health Advisory ("PHA") for PFOS and for PFOA.

68.     The EPA develops PHAs to provide information in response to an urgent or rapidly developing situation. PHAs reflect reasonable, health-based hazard concentrations above which action should be taken to reduce exposure to the identified drinking water contaminants.

69.     The 2009, the PHA for PFOS was 200 parts per trillion and the PHA for PFOA was 400 parts per trillion. The PHAs state that the discovery of PFOA and/or PFOS in water above the advisory levels should result in the discontinued use of the water for drinking and cooking.

70.     The Unregulated Contaminant Monitoring Rule ("UCMR") is used by the EPA as a monitoring vehicle for chemicals listed on the Contaminant Candidate List. The EPA also uses the UCMR to collect data for contaminants that are suspected to be present in drinking water and do not have health-based standards set under the Safe Drinking Water Act.

71.     The EPA's selection of contaminants for a particular UCMR cycle is based largely on a review of the Contaminant Candidate List.

72.     In 2012, the EPA included PFOS and PFOA in its Third Unregulated Contaminant Monitoring Rule ("UCMR 3"). By placing PFOS and PFOA on this list, the EPA required certain water providers across the country to test their water for the presence of PFOS and PFOA.

73.     In April 2016, PFOS was added to the New York State's list of hazardous

10

Case 2:18-cv-02496-JS-AYS   Document 1-1   Filed 04/27/18   Page 12 of 34 PageID #: 19

substances in connection with the Superfund cleanup program.

74.     In May 2016, the EPA revised its PHAs when it issued "final" Health Advisories for PFOS and PFOA.

75.     The final Health Advisory for PFOS is 70 parts per trillion and the final Health Advisory for PFOA also is 70 parts per trillion.  In addition, where both PFOS and PFOA are present, the combined Health Advisory limit also is 70 parts per trillion.

76.     The establishment of a Health Advisory level of 70 parts per trillion does not mean that lower levels of exposure are not dangerous, unhealthy and potentially toxic.

77.     Other agencies have suggested limiting exposure to even lower levels of PFOS and/or PFOA.  A panel of scientists studying the health impacts from PFOA-contaminated drinking water in and around Parkersburg, West Virginia found negative health outcomes associated with exposure to drinking water containing PFOA at 50 parts per trillion.

78.     Certain states also have promulgated advisory exposure levels lower than the EPA's advisory level, including the State of New Jersey, which promulgated an advisory exposure level for PFOA of 14 parts per trillion and the State of Vermont, which set its enforcement standard at 20 parts per trillion for PFOA and 30 parts per trillion for PFOS.

79.     Multiple studies suggest that even small concentrations of PFCs are harmful to humans.

**Local Contamination**

80.     Beginning in August 2017, the Suffolk County Department of Health Services began surveying the private water wells of residential homes between East Hampton Airport and Montauk Highway, when a well was found to have PFOS and PFOA above the EPA's Health Advisory limit of 70 parts per trillion.  Concerns arose after the East Hampton Airport, which is

11

owned by the Town of East Hampton, had indicated that products used or stored there may have contained PFOS and PFOA, including firefighting foam and coatings that repel water, oil, stains and grease.

81.    The discovery of contaminated drinking water wells led the Suffolk County Department of Health Services to offer free testing of private wells to the residents and property owners of the Village of Wainscott.

82.    Initially, the area that contained the impacted wells consisted of a roughly rectangular area bounded on the North by the East Hampton Airport; on the East by Daniels Hole Road; on the South by Montauk Highway; and on the West by Town Line Road, as set forth in the map attached hereto as Exhibit A (hereinafter, the "Affected Area"). There were approximately 246 homes in the Affected Area.

83.    Named plaintiff Shipman owns a single-family home within the Affected Area.

84.    Recently, the Affected Area was expanded and is now defined as follows: on the North by East Hampton Airport; on the East by Daniels Hole Road and Georgica Pond; on the South by Wainscott Main Street; and on the West by Town Line Road south to Montauk Highway and then south on Sayres Path to Wainscott Main Street, as set forth in the map attached hereto as Exhibit B (hereinafter the "Expanded Affected Area," which includes the initial Affected Area).

85.    The Health Department said the expansion was based on U.S. Geological Survey groundwater elevation maps detailing current groundwater flow. The Health Department stated that it planned to install groundwater monitoring wells to confirm the groundwater flow.

86.    There are approximately 300 homes in the Expanded Affected Area (including those in the initial Affected Area).

87.    As of February 15, 2018, 246 private wells had been sampled in the Expanded

12

Case 2:18-cv-02496-JS-AYS   Document 1-1   Filed 04/27/18   Page 14 of 34 PageID #: 21

Affected Area and results had been obtained for 233.

88.     Of the 233 results, 115 wells had no traces of PFOA or PFOS; 109 wells tested positive for PFOS and PFOA, but at levels lower than the EPA's Health Advisory standard of 70 parts per trillion; and nine wells tested positive for PFOS and PFOA at levels higher than the Health Advisory standard of 70 parts per trillion.

89.     Beginning in or around September, 2017, all residents in the Affected Area were offered free bottled water by the Town of East Hampton and advised not to drink, cook or shower with their private well water.  That program is still in place today.

90.     The same advice and offer of free bottled water recently was made to residents of the Expanded Affected Area as well.

91.     The total cost of providing bottled water to date is not known but probably exceeds hundreds of thousands of dollars.

92.     Upon information and belief, there are water filtration systems available that are capable of extracting PFOS and PFOA from contaminated well water.

93.     Upon information and belief, the average cost of such units for a single-family residence in the Expanded Affected Area is approximately $4,000.  To date, the Town of East Hampton has not offered to pay for or install such a system in any residence in the Expanded Affected Area.

94.     The Suffolk County Water Authority has informed the residents in the Expanded Affected Area that the municipal water supply (commonly referred to as "Town Water") is not contaminated with PFOA and PFOS.

95.     Upon information and belief, the average cost of connecting a single-family residence in the Expanded Affected Area to the municipal water supply is approximately $15,000.

13

Case 2:18-cv-02496-JS-AYS   Document 1-1   Filed 04/27/18   Page 15 of 34 PageID #: 22

To date, the Town of East Hampton has not offered to pay for any home in the Expanded Affected Area to be connected to the municipal water supply.

96.     There is no indication of when the drinking water in and around the Expanded Affected Area will be free of PFOS and PFOA contamination.

97.     Unless and until the drinking water in and around the Expanded Affected Area is free of PFOS and PFOA contamination, that drinking water poses an immediate health threat to every class member.

98.     To date, there has been no promise or plan to monitor the health of current and former residents in the Expanded Affected Area who obtain or obtained their drinking water from municipal wells and the Town of East Hampton has not proposed any form of relief to protect class members.

99.     There also has been no promise or plan to monitor the health of current and former residents in the Expanded Affected Area who obtain or obtained their drinking water from private wells and the Town of East Hampton has not proposed any form of relief to protect class members.

100.     In or around early February, 2018, the New York State Department of Environmental Conservation began installing point-of-entry systems to the contaminated wells with high PFOA and PFOS levels.  Such systems are designed to rid the water of toxins before the water enters a home's individual water system.

101.     On February 14, 2018, the Wainscott Citizens Advisory Committee sent a letter to the East Hampton Town Board asking for assistance from Suffolk County and the State of New York to connect residents in the Expanded Affected Area to municipal water.

102.     As a consequence of the contaminated water within the private wells, many residents are at risk of developing serious, adverse health effects; have suffered a loss of use and

14

Case 2:18-cv-02496-JS-AYS   Document 1-1   Filed 04/27/18   Page 16 of 34 PageID #: 23

enjoyment of their properties; and now own properties that are less valuable and less attractive to prospective renters and buyers.

## CLASS ACTION ALLEGATIONS

103. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

104. Plaintiff brings this action as a class action pursuant to Article 9 of the New York Civil Practice Law and Rules on behalf of a Class consisting of all other persons similarly situated as members of the proposed Subclasses:

> **Property Owner Subclass.** Current and former property owners who reside or have resided within the Expanded Affected Area for at least one year since 1970 to the present and who obtain or obtained their drinking water from a private well.

> **Non-Property Owner Subclass.** Current and former non-property owners who reside or have resided within the Expanded Affected Area for at least one year from 1970 to the present and who obtain or obtained their drinking water from a private well.

105. Excluded from the classes set forth above are: (a) defendants, any entity or division in which defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (b) New York State or any of its agencies; and (c) the Town of East Hampton, New York.

106. Collectively, the Property Owner Subclass and the Non-Property Owner Subclass are referred to as the "Subclasses."

107. The Subclasses and this action satisfy the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Article 9.

### Numerosity

108. The members of the Subclasses are so numerous that joinder of all members is impracticable. CVP §901(a)(1). The number of residences in the Expanded Affected Area is

15

Case 2:18-cv-02496-JS-AYS    Document 1-1    Filed 04/27/18    Page 17 of 34 PageID #: 24

estimated to be approximately 300; the number of residents is estimated to be approximately 400.

Subclass members can be easily identified from public records, such as property tax records and

employment records.  All such Subclass members may be notified of the pendency of this action

by United States mail, electronic mail or social media (as approved by the Court).

## Typicality

109.    Plaintiff's claims are typical of the claims of the members of the Subclasses

inasmuch as all members of the Subclasses are similarly affected by defendants' misconduct

resulting in injury to all members of the Subclasses.  NYCPLR §901(a)(3).

## Adequate Representation

110.    Plaintiff will fairly and adequately protect the interests of members of the

Subclasses and have retained counsel competent and experienced in class action litigation.  CVP

§901(a)(4).

111.    Plaintiff and her counsel are committed to vigorously prosecuting this action on

behalf of the Subclasses and have the financial resources to do so.

112.    Neither plaintiff nor her counsel has interests adverse to any of the Subclasses.

## Predominance of Common Questions

113.    There are questions of law or fact common to the class which predominate over

any questions affecting only individual members. CVP §901(a)(2). The answers to these common

questions will advance resolution of the litigation as to all class members.  These common legal

and factual issues include:

(i)      Whether defendants owed a duty to plaintiff and members of the Subclasses;

(ii)     Whether defendants knew or should have known that their manufacture of AFFF

containing Toxic Surfactants was unreasonably dangerous;

16

(iii)    Whether defendants knew or should have known that their AFFF contained persistent, non-biodegradable chemicals that were likely to contaminate drinking water supplies;

(iv)    Whether defendants failed to warn users of the potential for harm that followed use of their products;

(v)    Whether defendants became aware of health and environmental harm caused by their AFFF products and failed to inform users of same;

(vi)    Whether defendant Town of East Hampton knew or should have known that its commercial rental tenants were dumping, releasing or otherwise allowing toxic chemicals into the groundwater in and around the Expanded Affected Area; and

(vii)    Whether the members of the Subclasses have sustained damages and the proper measure of damages.

### Superiority

114.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  CVP §901(a)(5).

115.    Defendants have acted on grounds generally applicable to the Subclasses, thereby making appropriate final legal and equitable relief with respect to the class as a whole.

116.    Furthermore, as the damages suffered by individual Subclass members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Subclasses to individually redress the wrongs done to them.

117.    Class treatment of common questions of law and fact will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

118.    There will be no difficulty in the management of this action as a class action.

17

## Injunctive Relief

119. In addition to the above, plaintiff and the members of the Subclasses seek injunctive relief through this class action because defendants have acted or refused to act on grounds that apply generally to the Subclasses as a whole, such that final injunctive relief is appropriate with respect to each of the Subclasses as a whole.

120. Such injunctive relief includes, but is not limited to, (i) an injunction to require the funding and implementation of a medical monitoring program consisting of blood testing for the presence of PFOS and/or PFOA and periodic testing after the initial baseline figures are established to ensure that plaintiff and members of the Subclasses are adequately protected from the potentially injurious effects of PFOS and PFOA on the human body, (ii) the installation of water filtration systems, and (iii) the connection of each residence in the Expanded Affected Area to the municipal water supply provided by the County of Suffolk.

### FIRST CAUSE OF ACTION
### Medical Monitoring – Against All Defendants

121. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth in full herein.

122. As a result of defendants' negligence, plaintiff and the Subclasses have been subjected to exposure greater than normal background levels of PFOS and PFOA.

123. As a proximate result of their exposure, plaintiff and the Subclasses have a significantly increased risk of contracting a serious latent disease.

124. A monitoring procedure exists that makes the early detection of such latent diseases possible.

125. The prescribed monitoring regime for the early detection of latent diseases caused

18

by exposure to PFOS and PFOA is different from that normally recommended in the absence of the exposure.

126.    The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

127.    Defendants' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of plaintiff and members of the Subclasses.

## SECOND CAUSE OF ACTION
### Negligence – Against the Manufacturing Defendants

128.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth in full herein.

129.    Defendants had a duty to manufacture, market, and sell their AFFF in a manner that avoided harm to those who foreseeably would come into contact with it.

130.    Defendants knew or should have known that the manufacture of AFFF containing Toxic Surfactants was hazardous to human health and the environment.

131.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to manufacture AFFF using Toxic Surfactants because it was a near certainty that the chemicals would migrate off of the East Hampton Airport property and contaminate the nearby groundwater and drinking water supply.

132.    Plaintiff and the Subclasses were foreseeable victims of the harm caused by defendants' AFFF.

133.    As a result of defendants' breach of their legal duty, the drinking water in and around the East Hampton Airport and the private wells in the Expanded Affected Area, are

contaminated with unsafe levels of PFOS and PFOA.

134.    As a result of defendants' negligent, reckless and/or intentional acts and omissions alleged herein, the drinking water from private wells in the Expanded Affected Area are contaminated with PFOS and PFOA.

135.    Defendants' negligent manufacture, sale, or distribution of AFFF caused and is causing unknowing plaintiff and the Subclass members an increased risk of associated illnesses due to the presence of PFOS and PFOA in their drinking water.

136.    Contamination of plaintiff's and the Subclasses' drinking water has resulted in the diminution of the value of properties in and around the Expanded Affected Area.

137.    Defendants' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of plaintiff and the Subclasses.

138.    As a direct and proximate result of defendants' actions and omissions, plaintiff and the Subclasses have suffered and continue to suffer an increased risk of developing serious adverse medical conditions; monetary damages associated with the treatment and remediation of their drinking water; monetary damages associated with the cost of connecting to the municipal water supply; and such other monetary damages as are required to fully compensate plaintiff and the Subclasses for the loss of value of their properties.

### THIRD CAUSE OF ACTION
**Defective Product - Failure to Warn**
**Against the Manufacturing Defendants**

139.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth in full herein.

140.    At all times relevant, defendants (except the Town of East Hampton) were in the

20

business of, among other things, manufacturing, selling, or otherwise distributing AFFF.

141.    As manufacturers, sellers, or distributors of a commercial product, defendants had a duty to provide reasonable instructions and warnings about the risks of injury posed by their products.

142.    Defendants knew or should have known that the foreseeable storage, use and disposal of the AFFF that they manufactured, sold, and distributed had the capacity to enter the water supply, to persist there for decades, and to cause harm to human health and the environment.

143.    These risks were not obvious to users of the AFFF.

144.    Upon information and belief, defendants failed to provide warnings to the users that use of defendants' AFFF could result in the contamination of groundwater and drinking water supplies.

145.    Upon information and belief, defendants failed to provide warnings to the users of the dangers to human health and the environment if their AFFF was permitted to contaminate the groundwater or drinking water supply.

146.    Adequate instructions and warnings would have reduced or avoided the foreseeable risks of harm posed by the AFFF.

147.    Had defendants provided adequate warnings, the users of their AFFF would have taken adequate measures to store, use, and dispose of AFFF so as to reduce or eliminate groundwater and drinking water contamination from AFFF.

148.    As a result of defendants' failure to warn against the likelihood of contamination from their AFFF, the groundwater and drinking water became contaminated with PFOS and PFOA.

21

149.    As a direct and proximate result of defendants' failure to warn of the environmental and health impacts caused by their AFFF, the drinking water supplies in and around the Expanded Affected Area became contaminated with PFOS and PFOA and have caused health risks to plaintiff and the Subclasses.

150.    Defendants' failure to provide adequate warnings or instructions renders defendants' AFFF a defective product.

151.    As a result of defendants' manufacture, sale, or distribution of a defective product, defendants are strictly liable in damages to plaintiff and the Subclasses.

152.    As a direct and proximate result of defendants' actions and omissions, plaintiff and the Subclasses have suffered and continue to suffer an increased risk of developing serious adverse medical conditions; monetary damages associated with the treatment and remediation of their drinking water; monetary damages associated with the cost of connecting to the municipal water supply; and such other monetary damages as are required to fully compensate plaintiff and the Subclasses for the loss of value of their properties.

153.    Defendants' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of plaintiff and members of the Subclasses.

## FOURTH CAUSE OF ACTION
### Defective Product - Design Defect
### Against the Manufacturing Defendants

154.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth in full herein.

155.    At all times relevant, defendants (except for the Town of East Hampton) were in the business of, among other things, manufacturing, selling, or otherwise distributing AFFF.

156.    It was foreseeable that toxic chemicals from the AFFF that defendants

22

Case 2:18-cv-02496-JS-AYS   Document 1-1   Filed 04/27/18   Page 24 of 34 PageID #: 31

manufactured, sold and distributed would enter the water supply of the plaintiff and the Subclasses and cause harm to their persons and property.

157.  Alternative designs of AFFF were available, technologically feasible and practical, and would have reduced or prevented the harm to plaintiff and the Subclasses.

158.  A reasonable alternative design would, at a reasonable cost, have reduced or eliminated the foreseeable risks of harm posed by AFFF.

159.  The AFFF manufactured, sold, or distributed by the defendants was defective in design because the foreseeable risk of harm posed by the AFFF could have been reduced or eliminated by the adoption of a reasonable alternative design.

160.  Defendants' products were defective at the time of manufacture, i.e., at the time they left defendants' control.

161.  As a result of defendants' manufacture, sale or distribution of a defectively designed product, the drinking water supplies in and around the East Hampton Airport and the Expanded Affected Area became contaminated with dangerous and toxic chemicals and damaged plaintiff and the Subclasses.

162.  As a result of defendants' manufacture, sale and distribution of a defective product, defendants are strictly liable in damages to the plaintiff and the Subclasses.

163.  As a direct and proximate result of defendants' actions and omissions, plaintiff and the Subclasses have suffered and continue to suffer an increased risk of developing serious adverse medical conditions; monetary damages associated with the treatment and remediation of their drinking water; monetary damages associated with the cost of connecting to the municipal water supply; and such other monetary damages as are required to fully compensate Plaintiffs and the

23

Subclasses for the loss of value of their properties.

164.    Defendants' acts were willful, wanton or reckless and conducted with a reckless

indifference to the rights of plaintiff and members of the Subclasses.

## FIFTH CAUSE OF ACTION
### Negligence – Against Town of East Hampton

165.    Plaintiff hereby incorporates by reference the allegations contained in the preceding

paragraphs of this Complaint as if they were set forth in full herein.

166.    The Town of East Hampton has a duty to its residents to protect their health and

welfare, including an obligation to protect the Town's drinking water and other natural resources.

167.    For this purpose, in 1999, the Town of East Hampton established a Department of

Natural Resources.

168.    The purposes of the Department of Natural Resources are set forth in the East

Hampton Town Code as follows:

> The natural features, resources and systems of East Hampton Town
> are vast in number and diverse in type. The stewardship of the flora,
> fauna, *ground and surface waters*, endangered species, distressed
> and problem wildlife, and other various natural features must be
> paid attention to if such natural features, resources and systems are
> to thrive. Planning tools such as inventories, monitors and
> mappings; educational tools such as outreach and training; and field-
> related tools such as inspections, restorations and maintenance
> activities shall be used by the Department to pursue the Town's
> policy of preserving, protecting and conserving its natural features,
> resources and systems.

East Hampton Town Code §180-3.

169.    The phrase "natural features, resources and systems" is defined in the East Hampton

Code as follows:

> All components of the natural environment, including, without
> limitation, *aquifers, water bodies*, drainage courses, freshwater and
> tidal wetlands, dunes, bluffs, beaches, escarpments, woodlands,

Case 2:18-cv-02496-JS-AYS   Document 1-1   Filed 04/27/18   Page 26 of 34 PageID #: 33

> shrublands, grasslands, large trees, glacial erratics, unique or unusual plants and trees, wildlife habitat and scenic views or overlook areas and all combinations thereof.

East Hampton Town Code §180-2.  Notably, "aquifer" and "water bodies" are the first two items mentioned.

170.     Section 180-5 lists 15 separate "Duties" of the Department of Natural Resources. See §180-5(B)(1) through (B)(15).  The third duty on the list relates to the "Identification and review of contaminants and harmful actions" and states:

> Contaminants, including but not limited to sewage, petroleum and toxins, and actions which have caused or are likely to cause impairment, damage or destruction to the Town's natural features, resources and systems shall be identified and reviewed.

See §180-5(B)(3).  Subsection (B)(4) states that any findings pertaining to contaminants shall be reported to the Town Supervisor and to any local, county, state of federal agencies with jurisdiction.

171.     And finally, Section (B)(6) governs water testing and provides that "Groundwater and surface water testing may be performed in accordance with a work program consistent with generally accepted scientific standards and practices."

172.     Defendant Town of East Hampton has breached the duties it has expressly undertaken, namely, to protect the health and welfare of its residents, particularly those in the Expanded Affected Area, by failing to ensure that their drinking water is free of contaminants.

173.     None of the members of the Subclasses is believed to have contributed to the presence of PFOA and PFOS in the drinking water found in private wells in the Expanded Affected Area.

174.     As a direct and proximate result of the Town of East Hampton's breaches of its duties, plaintiff and the Subclasses have suffered and continue to suffer an increased risk of

25

developing serious adverse medical conditions; monetary damages associated with the treatment and remediation of their drinking water; monetary damages associated with the cost of connecting to the municipal water supply; and such other monetary damages as are required to fully compensate plaintiff and the Subclasses for the loss of value of their properties.

## DAMAGES SOUGHT BY THE CLASS

175.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth in full herein.

176.    Plaintiff and the Subclasses seek damages sufficient to fund a medical monitoring program that is reasonably tailored to the exposure risks posed by PFOS and PFOA described above.

177.    Plaintiff also seeks damages sufficient to fund a blood test program to pay for the costs of an initial blood test, and such follow-up blood tests that are deemed necessary, to determine the current levels of PFOS and PFOA in the blood serum of the plaintiff and the Subclasses.

178.    Plaintiff and the Subclasses seek monetary damages for each violation of the First through Fifth Causes of Action.  In particular, plaintiff and the Subclasses seek monetary damages:

(i)     sufficient to remediate class members' private wells from the contamination caused by Defendants' conduct;

(ii)    to compensate all class members for the loss of use and enjoyment of their properties caused by Defendants' conduct;

(iii)   for the increased costs to obtain contaminant-free drinking water, including the costs of alternative drinking water sources (connection to municipal water supply) or the installation and maintenance of an adequate filtration

26

Case 2:18-cv-02496-JS-AYS   Document 1-1   Filed 04/27/18   Page 28 of 34 PageID #: 35

system; and

(iv)    for such other monetary damages as are required to fully compensate plaintiff and the Subclasses for the loss of value of their properties caused by Defendants' conduct.

179.    Plaintiff and the Subclasses seek punitive damages in an amount sufficient to deter Defendants ' similar wrongful conduct in the future.

180.    In addition to the above, plaintiff and the Subclasses seek injunctive relief including, but not limited to, implementation of a mandatory testing protocol requiring Defendants to expeditiously test the wells of all Subclass members for the presence of PFOS and PFOA and to continue that testing until it is determined that the risk of PFOS and PFOA contamination in private wells has ended; to install permanent filtration devices on any private well testing positive for the presence of PFOS and/or PFOA, and to maintain those filtration devices pursuant to industry best practices; to establish and fund a blood testing program for plaintiff and members of the Subclasses; to establish and fund a medical monitoring program for plaintiff and members of the Subclasses; and to take all steps necessary to remediate the Expanded Affected Area such that all municipal and private water supplies of the members of the Subclasses are free from the presence of PFOS and PFOA.

## **PRAYER FOR RELIEF**

**WHEREFORE,** plaintiff, on behalf of herself and all others similarly situated, requests that the Court grant the following relief:

(i)    An order certifying the proposed Property Owner Subclass and Non-Property Owner Subclass and designating plaintiff as the named representatives of the respective Subclasses, and designating the

27

undersigned as Class Counsel;

(ii)     An order requiring Defendants (i) to implement a testing protocol to test the wells belonging to each member of the Subclasses; (ii) to install permanent filtration devices on any private well testing positive for the presence of PFOS and PFOA, or to facilitate the transition for the Property Owner Subclass to connect to a municipal water supply; (iii) to establish a blood testing program for plaintiff and the Subclasses; (iv) to establish a medical monitoring protocol for plaintiff and the Subclasses to monitor individuals' health and diagnose at an early stage any ailments associated with exposure to PFOS and PFOA; and (v) to take all necessary steps to remediate the property and/or residences of plaintiff and the Subclasses to eliminate the presence of PFOS and PFOA ;

(iii)    An award to plaintiff and the Subclass of compensatory, exemplary, and consequential damages, including interest, in an amount to be proven at trial;

(iv)    An award of attorneys' fees and costs;

(v)     An award of pre-judgment and post-judgment interest, as provided by law; and

(vi)    Such other and further relief as the Court deems just and proper.


Dated: March 21, 2018
        Southampton, New York


                                    Respectfully submitted,


                                    28

Case 2:18-cv-02496-JS-AYS   Document 1-1   Filed 04/27/18   Page 30 of 34 PageID #: 37

THE OSBORN LAW GROUP

By:    s/ Daniel A. Osborn
Daniel A. Osborn
THE OSBORN LAW GROUP
200 North Sea Road, Suite B
Southampton, New York 11968
Phone:       (631) 353-3355

*Attorneys for Plaintiffs*

## JURY DEMAND

Plaintiff demand a trial by jury of any and all issues in this action so triable of right.

29

# EXHIBIT A

FILED: SUFFOLK COUNTY CLERK 03/21/2018 10:32 AM
NYSCEF DOC. NO. 2

RECEIVED NYSCEF: 03/21/2018



# EXHIBIT B

RECEIVED NYSCEF: 03/21/2018

